1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| STEVE LIN,<br><br>       Plaintiff,<br><br>  vs.<br><br>METROPOLITAN LIFE INSURANCE<br>COMPANY and TRINET EMPLOYEE<br>BENEFIT INSURANCE PLAN,<br><br>       Defendants. | Case No:  C 15-2126 SBA<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

     Plaintiff Steven Lin ("Plaintiff") brings the instant action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, to challenge the termination of his long-term disability ("LTD") benefits under the Tri-Net Employee Benefit Insurance Plan ("Plan"), an ERISA-covered employee welfare benefit plan.  As Defendants, Plaintiff has named the Plan and its administrator, Metropolitan Life Insurance Company ("MetLife").

     The parties are presently before the Court on:  (1) Plaintiff's Motion for Summary Judgment; and (2) Defendants' Motion for Judgment Under Fed. R. Civ. Pro. 52.  Dkt. 37, 85.[1]  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS Plaintiff's motion and DENIES Defendants' motion.  The Court resolves the instant motions without oral argument.  Fed. R. Civ. P. 78(b); Civ. L.R. 7-1(b).

---

     [1] As will be set forth below, Plaintiff's motion is construed as a motion for judgment under Federal Rule of Civil Procedure 52, not as a motion for summary judgment.

# FINDINGS OF FACT[2]

## EMPLOYMENT HISTORY

1. Plaintiff is an adult male, born on August 24, 1962. Administrative Record ("AR") 1230. He holds a Ph.D. in Chemistry. AR 1053.

2. On May 2, 2002, Tri-Net Group, Inc. ("TriNet") hired Plaintiff to work on new product development. AR 424; 431-433.

3. In 2007, TriNet promoted Plaintiff to Director of Polymer Technologies. AR 1053. The requirements of that position include providing leadership and direction for subordinates, generating ideas, developing and executing action plans, and the ability to focus and concentrate. AR 445.

## TRINET'S LTD PLAN

4. During the course of his employment at TriNet, Plaintiff became a participant in the Plan. AR 445.

5. Benefits under the Plan are funded by a group policy of disability insurance issued by MetLife, which, at all relevant times, served as the claim administrator for benefits under the Plan. AR 1240.

6. The Plan identifies two eligible classes for benefits, as follows:

Class 1: All Full-Time Salaried, Professional, Officer and Management employees of Policyholder, but not temporary, seasonal, or employees working in Canada.

Class 2: All Salaried and Hourly employees of the Policyholder, but not temporary, seasonal or employees working in Canada.

AR 1265.

7. Plaintiff is a Class 1 employee. AR 423.

---

[2] To the extent any statement in the findings of fact makes reference to the law, it shall be deemed as both a finding of fact and conclusion of law. Likewise, to the extent that any conclusion of law includes any matter of fact, it shall be deemed to have been found by the Court to be both a finding of fact and conclusion of law.

8.      The Plan's definition of "Disability" depends on whether the employee is Class 1 or Class 2.  For Class 1 employees, such as Plaintiff, the following definition is applicable:

> **Disabled** or **Disability** means that, due to Sickness or as a direct result of accidental injury:
>
> - You are receiving Appropriate Care and Treatment and complying with the requirements of such treatment; and
> - You are unable to earn:
>   - more than 80% of your Predisability Earnings at Your Own Occupation from any employer in Your Local Economy.

AR 1259.  "Own Occupation" means "the essential functions You [i.e., the employee] regularly perform that provide Your primary source of earned income."  AR 1262.  "Local Economy" refers to the area in which the employee resides "which offers suitable employment opportunities within a reasonable distance."  AR 1261.

### MEDICAL AND CLAIMS HISTORY

9.      On or about April 20, 2010, Plaintiff ceased working at TriNet due to chronic renal (kidney) failure.  He thereafter submitted a claim for LTD benefits under the Plan. AR 1196.  In the claim form, Plaintiff indicated the following reasons for his inability to perform the duties of his job:  "Renal Failure, Headache, Chest Pain, Fatigue, Loss of Memory & Sleeping."  Id.

10.     On October 15, 2010, MetLife approved Plaintiff's application for benefits, effective July 30, 2010.  AR 1179.

11.     On March 13, 2011, Plaintiff, then 48 years old, underwent a kidney transplant due to end stage renal failure.  AR 887.  The source of the donor kidney was a cadaver.  AR 1196.  At the time of his surgery, Plaintiff was positive for Hepatitis B. AR 881.

12.     On June 27, 2011, Plaintiff saw Dr. Shahrzad Zarghamee, a nephrologist (kidney specialist), for a follow up visit.  AR 886.  Dr. Zarghamee documented that Plaintiff was taking various immunosuppressant medications to prevent the rejection of the transplanted kidney, Baraclude for his Hepatitis B infection, and Atenolol for dizziness,

among a host of other medications.  AR 886-87.  Her notes also indicate that the donor was positive for CMV (Cytomegalovirus), and that Plaintiff had tested positive for CMV, as well.  AR 886.  Plaintiff reported that he was "doing well," but felt dizzy, despite being on Atenolol.  AR 887.  "Headaches (7/4/2010)" along with "Other Malaise and Other Fatigue (1/11/2012)" are listed among Plaintiff's various "Problems."  AR 885.

13.     Subsequent to his initial follow up visit, Plaintiff continued to see Dr. Zarghamee regularly, often on a monthly basis.  Dr. Zarghamee's notes indicate that Plaintiff consistently suffered from debilitating headaches and chronic fatigue.  His headaches occurred more than once per day, typically lasting twenty to thirty minutes at a time.  In addition, he experienced dizziness after looking at a computer screen and then standing up, and was frequently extremely tired and fatigued.  As to the specific cause of Plaintiff's headaches and fatigue, Dr. Zarghamee was unsure.  However, she suspected that it may be caused by an interaction between Baraclude and Plaintiff's immunosuppressant medications.  AR 881-884 (6/7/11); AR 885-892 (6/21/11); AR 893-900 (7/12/11);  AR 901-907 (8/3/11); AR 908-916 (9/7/11); AR 926-933 (10/8/11); AR 917-925 (10/12/11); AR 934-941 (12/7/11); AR 942-949 (1/10/12); AR 950-957 (2/8/12); AR 958-965 (3/7/12); AR 727-729 (7/10/13); AR 525-534 (8/7/13); AR 581-591 (9/5/13); AR 615-628 (10/3/13); AR 644-655 (11/4/13); AR 662-673 (12/5/13); AR 446 (12/23/14).

14.     Dr. Zarghamee opined that Plaintiff was unable to perform sedentary work due to fatigue and an inability to focus.  AR 875.  As a result of these conditions, Plaintiff could no longer focus or concentrate, problem solve, provide leadership and supervision, generate ideas and plans or execute them.  AR  445.  His condition was so severe that he would experience "extreme exhaustion" from concentrating on the mundane matters, which, in the past, would have been "second nature" to him.  Id.  Dr. Zarghamee concluded that in light of these limitations, Plaintiff was likely to be absent from work four times per week and otherwise simply "cannot work." AR 444.[3]

---

[3] Dr. Zarghamee checked the box indicating that Plaintiff would be absent "[m]ore than four days per month," but handwrote "4 days/wk will miss work!"  AR 444.

**CLAIM REVIEW**

15.     As part of its claim review process, MetLife retained nephrologist Michael Gross, M.D., of MLS Peer Review Services for an "Independent Peer Review" of Plaintiff's medical records.  AR 517-523.  In his report, dated January 29, 2014, Dr. Gross noted that Plaintiff's renal function was "normal" and confirmed his subjective complaints of chronic fatigue and headaches.  AR 520-521.  Dr. Gross, however, did not expressly answer the question presented to him: "Does the medical information support functional limitations []physical or psychiatric, beyond 1-22-2014 onward?"  AR 521.  Instead, he opined that while there was subjective support for Plaintiff's complaints, "the objective information in the file or the physical examination [performed by one of Plaintiff's physicians] . . . does not document any objective findings to suggest the reasons for his fatigue."  AR 522.  Dr. Gross acknowledged that Plaintiff's "medications may be causing his fatigue, [but] none of these medications will ever be changed because he is a transplant patient and requires these medications on an ongoing basis."  Id.  Dr. Gross suggested that to confirm the validity of his complaints, Plaintiff should undergo an independent medical evaluation ("IME") or a consult with a specialist in chronic fatigue.  Id.

16.     Apparently in response to questions subsequently posed by MetLife, Dr. Gross prepared a supplemental report, dated May 5, 2014.  AR 467-473.  In this report, Dr. Gross indicated that MetLife construed his prior recommendation for an IME or specialist as a "potential treatment option [and] not as a current recommendation for clarification of functionality."  AR 472.  MetLife asked Dr. Gross to clarify or confirm what he meant.  Id. Dr. Gross restated that he is recommending that Plaintiff undergo an IME or consult with a chronic fatigue specialist.  Id.

17.     Defendants also claim that MetLife consulted with its "Medical Director"[4] and "Dr. Wolf," a neurologist, who reviewed Plaintiff's medical records and found "no clear etiology of plaintiff's fatigue, and no aggressive attempt to identify a specific

---

[4] Defendants do not identity the Medical Director, though the cryptic notes in the print-out seem to suggest that his name is David S. Peters, M.D.  AR 220.

cause . . . ."  Defs.' Mot. for J., Dkt. 85 at 13 (citing AR 217, 220-23).  No report from Dr. Wolf or the Medical Director is cited.  Rather, the only support for this assertion is what appears to be a print-out of a computerized claims activity log prepared by MetLife.  AR 217-18.

**TERMINATION OF BENEFITS**

18.     By letter dated July 24, 2014, MetLife notified Plaintiff that it had completed its evaluation of his claim for ongoing LTD benefits.  AR 458.  Incorrectly applying the definition of disability applicable to Class 2 employees, MetLife concluded that the "medical documentation provided to date fails to substantiate an ongoing Disability after 24 months of benefits payments as defined in your Employer's Plan," and therefore, notified Plaintiff that it was terminating benefits effective July 22, 2014.  AR 458, 461.  Citing reports from Dr. Gross, MetLife stated that there was "no clinical evidence to substantiate functional deficits due to subjective complaints of headaches."  AR 460-61.  MetLife also referred to a report by its Medical Director, who, on June 24, 2014, reviewed Plaintiff's records and found "no evidence or clear etiology to explain subjective complaints of fatigue."  AR 461.  The letter acknowledged that the Social Security Administration ("SSA") awarded Plaintiff Social Security Disability Insurance ("SSDI") benefits for his disabling conditions, but that such an award does not "guarantee the approval or continuation of long-term disability benefits . . . ."  AR 461.

19.     On January 16, 2015, Plaintiff, through counsel, submitted a letter to MetLife to appeal the termination of his LTD benefits.  AR 438.  The appeal included a Residual Functional Capacity Questionnaire and a letter prepared by Dr. Zarghamee, both dated December 23, 2014.  AR 438-445.  In addition, Plaintiff noted that he is a Class 1, as opposed to Class 2 employee, and therefore, his claim should have been evaluated under the "own occupation" definition of disability under the Plan.  Id.  Additionally, Plaintiff requested additional time to submit additional information.  Id.  Plaintiff submitted the supplemental information on January 28, 2015.  LIN 2010-2013.

20.     On February 2, 2015—three days after Plaintiff submitted the aforementioned supplemental information—MetLife issued a second denial letter.  AR 423-28.  This letter correctly applied the definition of disability applicable to Class 1 employees.  AR 423.  Other than this change, however, the February 2 letter is essentially identical to MetLife's prior letter from July 24, 2014.

21.     Plaintiff did not submit an appeal from MetLife's February 2, 2015 letter, but instead filed this lawsuit.

## PROCEDURAL HISTORY

22.     Plaintiff commenced the instant action in this Court on May 11, 2015.

23.     The Complaint alleges two ERISA claims:  (1) claim for benefits, 29 U.S.C. § 1132(a)(1)(B); and (2) duty to provide documents, 29 U.S.C. § 1332(a)(1)(A) and (c)(1).

24.     The first claim is based on the termination of Plaintiff's benefits on or about July 22, 2014.

25.     The second claim is predicated on a request for "relevant documents" submitted by Plaintiff to Defendants under 29 U.S.C. § 1332(a)(1)(A) and (c)(1) on September 8, 2014, and a request from February 10, 2015, for the qualifications of the medical reviewers and the internal guidelines and protocols used in processing his claim.  Compl. ¶ 22.

26.     As relief, the pleadings seek a declaration that Plaintiff is entitled to past due disability benefits along with the reinstatement of his benefits, statutory penalties in the amount of $110 per day for failing to provide the requested plan documents, and an award of costs.

27.     On July 20, 2015, Defendants filed their Answer, which includes an affirmative defense that Plaintiff's claims are barred as a result of his failure to exhaust administrative remedies.  Answer ¶¶ 19, 28, Dkt. 9.  Apparently in response to the assertion of that defense, Plaintiff submitted a "voluntary" appeal to MetLife on July 31, 2015.

28.     On February 18, 2016, Defendants filed a motion for judgment on the pleadings, arguing that Plaintiff's claim for benefits should be dismissed for failure to

exhaust administrative remedies.  Defendants further asserted that Plaintiff's second claim, which sought statutory penalties for failure to produce documents, was legally infirm.  In response, Plaintiff voluntarily abandoned his second claim for statutory penalties, but argued that his claim for benefits should not be dismissed for failure to exhaust.  Separately, Plaintiff filed a motion for leave to amend to allege facts regarding the appeal he submitted to MetLife on July 31, 2015, ostensibly to cure any failure to exhaust.

29.     On April 22, 2016, the Court issued a written order granting Defendants' motion to dismiss as to Plaintiff's claim for statutory penalties, but denying the motion with respect to Plaintiff's claim for benefits.  Dkt. 36.  In particular, the Court rejected Defendants' contention that Plaintiff was required to exhaust his administrative remedies prior to filing suit on the ground that Defendants had failed to identify any provision in the Plan imposing an exhaustion requirement.  <u>Id.</u> at 4.  In view of that finding, the Court denied Plaintiff's motion for leave to amend as moot.  <u>Id.</u> at 6.

## **CONCLUSIONS OF LAW**

### **STANDARD OF REVIEW**

30.     ERISA provides that a qualifying ERISA plan participant may bring a civil action in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B); <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 108 (2008).  As a participant in the Plan, Plaintiff has standing to seek judicial review of MetLife's termination of his benefits.  <u>See</u> <u>Chuck v. Hewlett Packard Co.</u>, 455 F.3d 1026, 1040 n.8 (9th Cir. 2006).

31.     A claim of denial of benefits in an ERISA case is to be reviewed "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989); <u>Montour v. Hartford Life & Acc. Ins. Co.</u>, 588 F.3d 623, 629 (9th Cir. 2009).  De novo review means that the court

"considers the matter anew, as if no decision had been rendered."  Dawson v. Marshall, 561 F.3d 930, 932-33 (9th Cir. 2009).

32.     Defendants contend that the Plan expressly grants MetLife discretionary authority to make eligibility determinations and to construe its terms, and therefore, MetLife's decision to terminate Plaintiff's LTD benefits should be reviewed for abuse of discretion.  AR 1296.  However, such grants of discretion are "void and unenforceable" under California Insurance Code section 10110.6.  Section 10110.6 provides, in relevant part, as follows:

> (a) If a policy, contract, certificate, or agreement offered, issued, delivered, or renewed, whether or not in California, that provides or funds life insurance or disability insurance coverage for any California resident contains a provision that reserves discretionary authority to the insurer, or an agent of the insurer, to determine eligibility for benefits or coverage, to interpret the terms of the policy, contract, certificate, or agreement, or to provide standards of interpretation or review that are inconsistent with the laws of this state, that provision is void and unenforceable.
>
> . . . .
>
> (g) This section is self-executing.  If a life insurance or disability insurance policy, contract, certificate, or agreement contains a provision rendered void and unenforceable by this section, the parties to the policy, contract, certificate, or agreement and the courts shall treat that provision as void and unenforceable.

Cal. Ins. Code § 10110.6 (emphasis added).  Section 10110.6 became effective January 1, 2012, id., prior to the denial of Plaintiff's claim for LTD benefits on July 22, 2014, see Grosz-Salomon v. Paul Revere Life Ins., 237 F.3d 1154, 1159 (9th Cir. 2001) (finding that an ERISA claim accrues at the time the benefits are denied).

33.     Defendants argue—without citation to any decisional authority—that section 10110.6 is inapplicable where the grant of discretion is an "integral part of the ERISA welfare benefit plan's plan document, not part of an insurance policy or certificate."  Dkt. 85 at 16.  Although the Ninth Circuit has not yet reached this issue, federal district courts, including numerous judges from this District, consistently have rejected Defendants' construction of section 10110.6.  See Nagy v. Grp. Long Term Disability Plan for

Employees of Oracle Am., Inc., No. 14-CV-00038-HSG, 2016 WL 1611040, at *10 (N.D. Cal. Apr. 22, 2016) (Grewal, M.J.) (citing cases).  The rationale underlying those decisions is that limiting section 10110.6 only to cases where a grant of discretion is contained in the insurance policy or certificate would render the statute "practically meaningless."  Gonda v. The Permanente Med. Grp., Inc., 10 F. Supp. 3d 1091, 1095 (N.D. Cal. 2014) (Conti, J.). The Court finds the rationale underlying those decisions to be persuasive and likewise concludes that section 10110.6 renders the Plan's grant of discretion to be unenforceable.[5]

34.     In cases where de novo review applies, the Court adjudicates the matter as a bench trial based on the administrative record, pursuant to Federal Rule of Civil Procedure 52.  Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th Cir. 1999) (en banc).[6] "When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan."  Muniz v. Amec Const. Mgmt., Inc., 623 F.3d 1290, 1295-96 (9th Cir. 2010).  "[W]hen the court reviews a plan administrator's decision under the de novo standard of review, the burden of proof is placed on the claimant."  Id. at 1294.  The Court is to "evaluate the persuasiveness of conflicting testimony," and make findings of fact.  Kearney, 175 F.3d at 1095.  This is considered a "bench trial on the record," which may "consist[] of no more than the trial judge rereading [the administrative record]."  Id.  The Court's review is limited to the administrative record unless "circumstances clearly establish that additional evidence is

---

[5] Under the abuse of discretion standard, a court must uphold a plan administrator's interpretation of the plan unless it is unreasonable; that is, such decision is arbitrary and capricious.  Moyle v. Liberty Mut. Ret. Ben. Plan, 823 F.3d 948, 958 (9th Cir. 2016).  In this case, even if the Court were to review MetLife's decision under the more deferential abuse of discretion standard, the Court's ruling on the instant motions would remain the same.

[6] Because a de novo standard of review applies, the Court construes both parties' motions under Federal Rule of Civil Procedure 52(a)(1).  See Kearney, 175 F.3d at 1095.

necessary to conduct an adequate de novo review." Id. at 1090 (quoting Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan, 46 F.3d 938, 944 (9th Cir. 1995)).[7]

**PLAINTIFF'S DISABILITY**

35.     The salient issue presented is whether Plaintiff's conditions render him disabled such that he is entitled to the reinstatement of LTD benefits under the Plan.  As noted, Plaintiff is considered disabled, as that term is defined by the Plan, if, as a result of injury or sickness, he is: (1) receiving appropriate care and treatment and is complying with the requirements of such treatment; and (2) unable to earn 80% of his pre-disability earnings from his own occupation.  AR 423-28.  The record supports Plaintiff's claim that he is disabled under that standard.

36.     The Director position held by Plaintiff requires him to provide leadership and direction for his team, along with the ability to focus and concentrate, generate ideas, and develop and execute action plans.  AR 445.  Plaintiff's treating physicians documented that he suffers from headaches and extreme fatigue, and that such conditions render it effectively impossible for Plaintiff to reliably perform the essential functions of his position.  They opined that these conditions could be the result of Plaintiff's antirejection medications, coupled with his use of Baraclude, a medication to treat his hepatitis.  In summarizing her years of treating Plaintiff, Dr. Zarghamee opined that "no good treatment is available."  AR 446.  If Plaintiff discontinued his antirejection medications, he could lose his kidney, thereby requiring lifelong dependence on dialysis.  Discontinuation of Baraclude will lead to "activation" of Hepatitis B, which, in turn, would lead to kidney and liver failure.  Id.  The overall record is more than sufficient to establish that Plaintiff is disabled within the meaning of the Plan.  See Salomaa v. Honda Long Term Disability

---

[7] Plaintiff's motion appends 225 pages of documents outside of the administrative record.  LIN 2000-2225.  Defendants object to these documents.  Dkt. 85 at 21.  While the Court has the discretion to consider materials outside of the administrative record, see Kearney, 175 F.3d at 1095, it is unnecessary to consider the additional records adduced by Plaintiff to assess whether he is entitled to reinstatement of his LTD benefits.  Although this Order contains some citations to the extra-record documents for context, the cited facts do not form the basis for the Court's ruling.  Accordingly, Defendants' objection is overruled as moot.

Plan, 642 F.3d 666, 676-79 (9th Cir. 2011) (evidence showing that the doctors who personally examined the claimant concluded that he was disabled, even though insurance company's non-examining physicians found otherwise, supported finding that the claimant was disabled under terms of the plan); see also Sabatino v. Liberty Life Assurance Co. of Boston, 286 F. Supp. 2d 1222, 1231 (N.D. Cal. 2003) ("Plaintiff was employed as an engineer, which may be a sedentary occupation, but one that requires careful thought and concentration. Simply being able to perform sedentary work does not necessarily enable one to work as an engineer.").

37.     Defendants acknowledge that Plaintiff's medical providers consistently documented his ongoing headaches and extreme fatigue, but nonetheless attempt to justify MetLife's termination decision on the ground that the etiology of those conditions is not supported by any objective medical findings.  The lack of a definitive diagnosis, however, is not a proper ground upon which to terminate LTD benefits.  Salomaa, 642 F.3d at 677 (rejecting insurer's requirement that the plan participant present objective evidence or clinical proof to substantiate a disability based on chronic fatigue); see also Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 873 (9th Cir. 2008) (noting that an insurer's failure to pay LTD benefits may be suspect where it is "based on [plaintiff]'s failure to produce evidence [of pain] that simply is not available").

38.     Defendants also contend that Plaintiff's medical records demonstrate that his symptoms are not disabling within the meaning of the Plan, and he is otherwise not complying with the treatment plan prescribed by his medical providers.  Dkt. 85 at 18-19.  The records cited by Defendants consist of office notes prepared by Dr. Zarghamee from Plaintiff's various office visits.  Upon reviewing those documents, the Court finds that they do not support Defendants' contentions.

a.     Defendants cite notes from an office visit on November 8, 2011, at which Plaintiff allegedly "declined a 'long workup' which was recommended by his doctor as a means to determine if CMV and/or EBV [Epstein-Barr Virus] caused his claimed fatigue symptoms."  Dkt. 85 at 18 (citing AR 929).  In fact, the notes do not state that he

"declined" to undergo testing.  Rather, they merely state:  "Will monitor CMV and EBV. Wants to wait before we embark on a long workup.  He believes he just needs to be patient."  AR 929.  Plaintiff's apparent desire to wait to see if his conditions improved does not suggest, let alone, demonstrate that he was not compliant with the directions of his medical providers.  In addition, there is no indication that Dr. Zarghamee expressed any concern regarding Plaintiff's desire to defer the work up.

b.      Defendants assert that Plaintiff ignored medical advice to start taking Ditropan, a medication for overactive bladder. Dkt. 85 at 18 (citing AR 951).  According to Defendants, Plaintiff suffers from an overactive bladder that disrupts his sleep, which, in turn, causes his fatigue.  Id.  In her office notes from January 10, 2012, Dr. Zarghamee expressed concern that Plaintiff may be suffering from Chronic Fatigue Syndrome, as opposed to Nocturia (a condition in which the individual wakes up at night feeling the need to urinate).  AR 945.  Nonetheless, she referred Plaintiff to a urologist for a "further evaluation."  Id.  Dr. Zarghamee's notes from Plaintiff's next visit on February 8, 2012, indicate:  "Saw urologist active Bladder, normal.  Given [D]itropan not started."  AR 951. Defendants seize upon the "not started" notation as proof that Plaintiff had disregarded his physician's orders.  Yet, there is no explanation in Dr. Zarghamee's office notes as to why the medication was not started.  The Court does note that the records from Plaintiff's September 5, 2013, appointment indicate that Plaintiff was taking Ditropan, but stopped for reasons he could not recall.  AR 581.[8]  As such, she recommended that he resume taking Ditropan.  AR 583, 619.  At a subsequent office visit on November 4, 2013, Dr. Zarghamee indicated that Plaintiff had been taking Ditropan as prescribed but that it proved ineffective and did not prevent Plaintiff from waking up three to four times per night to urinate.  AR 644.  In sum, although there is some evidence in the record that Plaintiff may have temporarily stopped taking Ditropan, that fact does not support the conclusion that Plaintiff was not in compliance with his treatment plan.

_____

[8] Defendants improvidently cite AR 524, Dkt. 85 at 18, which appears to be a facsimile cover sheet that does not in any way discuss Plaintiff's prescription for Ditropan.

c.      Defendants point to an office note from August 11, 2013, wherein Plaintiff reported taking a two week trip to China to visit his father.  Dkt. 85 at 18 (citing AR 724).  Though not entirely clear, Defendants appear to suggest that Plaintiff's ability to travel supports MedLife's conclusion that he is not disabled.  But Defendants' summary of Dr. Zarghamee's office note is incomplete.  In discussing Plaintiff's trip, Dr. Zarghamee indicated that Plaintiff reported being "very tired but his legs are heavy and fatigue." AR 724.  Elsewhere in the record, Plaintiff confirmed that the trip was "low key" and that he "did not do much."  AR 161.  Thus, the mere fact that Plaintiff travelled to China does not undermine his claim that his conditions are debilitating.

d.      Defendants claim that in August 2013, Dr. Zarghamee instructed plaintiff to return to his neurologist for treatment of his headaches, but that he failed to follow through with her instructions.  Dkt. 85 at 18 (citing AR 160-64, 724).  However, Defendants omit Plaintiff's explanation that he had not seen his neurologist in "awhile because last time he saw the Neurologist they [sic] said really not much they could do for me so essentially treats primarily with Dr. Shahrzad Zarghamee monthly."  AR 161.  Thus, the cited office notes do not support the notion that Plaintiff failed to follow the instructions of Dr. Zarghamee.

e.      Defendants claim that Plaintiff was "unwilling to change his hepatitis medication from Baraclude to Viread, which was recommended by his doctor as a way to determine whether Baraclude had caused him to experience the reported fatigue."  Dkt. 85 at 18 (citing AR 630).  This again mischaracterizes the record.  Dr. Zarghamee's notes recite that she and Plaintiff "discussed continuing the Baraclude versus switching to Viread to see if it helps the fatigue."  AR 630.  Dr. Zarghamee indicated that although "the likelihood is low" that switching to Viread would improve Plaintiff's fatigue, she was willing to change his medication.  Id.  The record does not support the conclusion that Plaintiff was unwilling to change his medication, or that Dr. Zarmaghee had instructed him to do so.

f.      Finally, Defendants attribute Plaintiff's fatigue to his consumption of caffeinated beverages in the latter part of the day, notwithstanding warnings from his doctor that caffeine could disrupt his sleep.  Dkt. 85. at 18 (citing AR 615).  The notes referred to by Defendants are from Plaintiff's visit with Dr. Zarghamee on October 3, 2013.  Dr. Zarghamee remarks that:  "When I go through products he eats or drinks he still is drinking tea in the afternoon and early evening which might be influencing his sleep patterns."  AR 615.  Among her recommendations at the conclusion of that office visit is an instruction to"[s]top drinking any kind of caffeinated product after 12 noon."  AR 619.  There is no mention in Dr. Zarghamee's notes from subsequent office visits that Plaintiff was not in compliance with that instruction.  E.g., 644, 662.  Nor is there any indication in the record that, prior to Plaintiff's office visit on October 3, 2013, Dr. Zarghamee expressly instructed Plaintiff to stop drinking tea in the afternoon.[9]

g.      In sum, the isolated and out-of-context medical notes cited by Defendants are insufficient to establish that MetLife had a reasonable basis for concluding that Plaintiff was not disabled or not in compliance with his treatment plan.[10]

### PAPER REVIEW

39.      Aside from the medical records discussed above, other aspects of the administrative record also persuade the Court that MetLife erroneously terminated Plaintiff's benefits.  In particular, the Court finds it significant that MetLife terminated Plaintiff's benefits without actually examining him.

40.      The Ninth Circuit has recognized that an insurer's decision to conduct "a 'pure paper' review . . , that is, to hire doctors to review [the claimaint]'s files rather than to conduct an in-person medical evaluation of him" may raise "questions about the

---

[9] Records from an August 7, 2013, office visit with Dr. Zarghamee does note Plaintiff's increased intake of caffeine, AR 724, but there is no discussion of whether such intake is related to his fatigue.  Nor is there any recommendation by Dr. Zarghamee regarding his consumption of caffeinated drinks.  AR 725-26.

[10] It bears noting that MetLife's termination letters did not mention Plaintiff's alleged failure to comply with the treatment plan prescribed by his providers as a basis for denying continued benefits.

thoroughness and accuracy of the benefits determination."  <u>Montour v. Hartford Life & Acc. Ins. Co.</u>, 588 F.3d 623, 634 (9th Cir. 2009) (citations and internal quotations omitted); <u>Salomaa</u>, 642 F.3d at 676 (noting that the only doctors who concluded the plaintiff was not disabled "were . . . the physicians the insurance company paid to review his file").

41.   Here, MetLife's termination decision was predicated principally on the reports of its outside consultant, Dr. Gross, and its Medical Director.  AR 460-61.  Both of these individuals evaluated Plaintiff's claim for benefits without physically examining him.  Dr. Gross repeatedly recommended to MetLife that an in-person examination of Plaintiff should be performed, either in the form of an IME or a consultation with a chronic fatigue specialist.  Yet, no such examination took place.  AR 472, 522.  While MetLife was not necessarily required to conduct a personal examination of Plaintiff as a prerequisite to terminating his benefits, the fact that MetLife failed to do so—in contravention to the recommendation of its own consultant—further underscores the result-driven nature of MetLife's decision to terminate Plaintiff's benefits.  <u>See Valente v. Aetna Life Ins. Co.</u>, No. SACV1400350JVSRNBX, 2015 WL 5091590, at *4 (C.D. Cal. July 1, 2015) (finding that, in the context of de novo review, the insurer's decision to conduct a purely paper review of the claim was a relevant factor to consider in evaluating the administrator's decision).

### SSA AWARD

42.   MetLife also failed to adequately address the fact that the SSA awarded SSDI benefits to Plaintiff.  Although such an award is not dispositive of whether a claimant is entitled to LTD benefits, <u>see Montour</u>, 588 F.3d at 635, the Ninth Circuit has held that a plan administrator cannot simply ignore the SSA's decision to award disability benefits, and that the failure to adequately address such decision may constitute an abuse of discretion, <u>see Salomaa</u>, 642 F.3d at 679 ("Evidence of a Social Security award of disability benefits is of sufficient significance that failure to address it offers support that the plan administrator's denial was arbitrary, an abuse of discretion"); <u>Montour</u>, 588 F.3d at 635 ("complete disregard for a contrary conclusion without so much as an explanation raises

questions about whether an adverse benefits determination was 'the product of a principled and deliberative reasoning process.'") (citations omitted).[11]

43.     In <u>Montour</u>, the court explained that "[o]rdinarily, a proper acknowledgment of a contrary SSA disability determination would entail <u>comparing and contrasting</u> not just the definitions employed but also the medical evidence upon which the decisionmakers relied." 588 F.3d at 636 (emphasis added); <u>see also</u> <u>Salz v. Standard Ins. Co.</u>, 380 Fed. App'x 723, 724 (9th Cir. June 1, 2010) ("A proper administrative process will meaningfully discuss a claimant's award of social security benefits . . . [and] analyz[e] the distinctions between the basis for the two awards").   MetLife failed to conduct this type of comparative analysis.  In both of its termination letters, MetLife simply dismissed the SSA's award by noting, in an entirely general manner, that: "Our decision may differ from that of the SSA because they may not have the same information that was utilized in making our decision." AR 461.  That type of generic analysis is not the type of "comparing and contrasting" of medical definitions and evidence mandated in <u>Montour</u>.

44.     Defendants argue that the SSA award was based on Plaintiff's pre-transplant disability as of April 29, 2010, and is unrelated to his post-transplant fatigue and headaches. Dkt. 85 at 23-24 (citing AR 870-74).  Perhaps so, but Defendants waived this argument as a result of MetLife's failure to mention this rationale in its termination letters.  Under ERISA, a notification of adverse action must recite the "specific reason or reasons for the adverse determination" and "reference to the specific plan provisions on which the determination is based." 29 C.F.R. § 2560.503-1(g)(1).  An insurer will be deemed to have waived the right to rely on any reason not cited in the denial letter.  <u>See, e.g.</u>, <u>Harlick v. Blue Shield of Cal.</u>, 686 F.3d 699, 719 (9th Cir. 2012) ("A plan administrator may not fail to give a reason for a benefits denial during the administrative process and then raise that reason for the first time

_____

[11] Although MetLife's termination decision is reviewed de novo, and not for abuse of discretion, the failure to meaningfully address an SSA award of benefits remains germane.  <u>See</u> <u>Rodas v. Standard Ins. Co.</u>, No. EDCV 13-2203-JGB (SPx), 2015 WL 5156455, *7-8 (C.D. Cal. Sept. 1, 2015) ("While the de novo standard of review applies in this case, the Court must take into account the 'weighty evidence' that the SSA found that Plaintiff was disabled.").

when the denial is challenged in federal court, unless the plan beneficiary has waived any objection to the reason being advanced for the first time during the judicial proceeding"). While MetLife could have sought to distinguish the SSA award on the ground that it now asserts, i.e., that the SSA award pertained to a different disability, the fact remains that it failed to do so when it terminated Plaintiff's benefits.  As such, MetLife cannot attempt to downplay the significance of the SSA award on a ground that was not specified in its termination letter.

LIMITATION ON CHRONIC FATIGUE SYNDROME BENEFITS

45.     Finally, Defendants contend that even if Plaintiff were disabled within the meaning of the Plan, he would not be entitled to any additional payment of benefits.  Dkt. 85 at 20; Dkt. 90 at 10-11.  In particular, they draw the Court's attention to a provision in the Plan that limits the payment of benefits in cases where the disability is attributable to Chronic Fatigue Syndrome.  That provision states:

> If You are Disabled due to:
>
> . . .
>
> 2.     Chronic fatigue syndrome and related conditions.
> We will limit Your Disability benefits to a lifetime maximum equal to the lesser of:
> •     24 months; or
> •     The Maximum Benefit Period.

AR 1281.

46.     According to Defendants, Dr. Zarghamee's notes indicate that Plaintiff had been complaining of chronic fatigue since September 2011.  Dkt. 85 at 20 (citing AR 441).  In view of that reference, coupled with the Plan's 24-month limitation on benefits for Chronic Fatigue Syndrome, Defendants assert that Plaintiff's right to such benefits would have lapsed as of September 2013—prior to the July 2014 effective date MetLife terminated his benefits.

47.     Defendants' argument fails on multiple levels.  First, Dr. Zarghamee did not actually diagnose Plaintiff with Chronic Fatigue Syndrome.  Rather, she indicated that the

type of fatigue Plaintiff was experiencing was not "typical" in transplant patients, but was "typical with Chronic Fatigue Syndrome."  AR 441.

48.     Second, Defendants' contention that Plaintiff's benefits lapsed as of September 2013 (i.e., 24 months after Dr. Zarghamee mentioned the term Chronic Fatigue Syndrome) is contradicted by the fact that they continued to pay benefits through July 2014.  Indeed, there is no indication that MetLife deemed Plaintiff disabled due to Chronic Fatigue Syndrome in the first instance.

49.     Third, and perhaps most fundamentally, Defendants waived application of this limitation by failing to rely on it when terminating Plaintiff's benefits.  In neither of its two termination letters did MetLife find that Plaintiff's disability claim was subject to the 24-month limitation for disability claims based on Chronic Fatigue Syndrome.  Nor did MetLife assert that Plaintiff's right to receive benefits lapsed as of September 2013.  To the contrary, MetLife clearly stated that it was terminating benefits on the grounds that there was "no clinical evidence to substantiate functional deficits due to subjective complaints of headaches," AR 460-61, and "no evidence or clear etiology to explain subjective complaints of fatigue," AR 461.  Having failed to raise the 24-month limitation for Chronic Fatigue Syndrome claims in its terminations letters, MetLife cannot belatedly do so now. See Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona, Inc., 770 F.3d 1282, 1296 (9th Cir. 2014) ("an administrator may not hold in reserve a known or reasonably knowable reason for denying a claim, and give that reason for the first time when the claimant challenges a benefits denial in court.").

50.     The Court finds that Plaintiff's right to benefits in this case is not subject to the Plan limitation for benefits paid due to Chronic Fatigue Syndrome.

### REMEDY

51.     As relief, Plaintiff seeks the reinstatement of his LTD benefits, retroactive to July 23, 2014, which is the day after his benefits were terminated.  Where plan benefits are unjustifiably terminated, the Court may order the reinstatement of those benefits. Pannebecker v. Liberty Life Assur. Co. of Boston, 542 F.3d 1213, 1221 (9th Cir. 2008)

1  (holding the district court erred in failing to retroactively reinstate long-term disability

2  benefits wrongfully terminated by the defendant); Grosz-Salomon, 237 F.3d at 1164

3  (affirming district court's award of benefits and denial of request to remand where

4  disability insurer abused its discretion by terminating benefits).  In the present case, the

5  Court has determined that MetLife terminated Plaintiff's LTD benefits based on an

6  erroneous determination that he was no longer disabled.  Retroactive reinstatement of

7  benefits is therefore the appropriate remedy.

8       52.     In addition to reinstating Plaintiff's benefits, the Court may, in its discretion,

9  award prejudgment interest on an award of ERISA benefits.  Blankenship v. Liberty Life

10  Assur. Co. of Boston, 486 F.3d 620, 627 (9th Cir. 2007).  "Generally, 'the interest rate

11  prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the

12  rate of pre-judgment interest unless the trial judge finds, on substantial evidence, that the

13  equities of that particular case require a different rate.'"  Id. (quoting Grosz-Salomon, 237

14  F.3d at 1164).  Under 28 U.S.C.§ 1961(a), "interest shall be calculated from the date of the

15  entry of the judgment, at a rate equal to the weekly average 1-year constant maturity

16  Treasury yield [i.e., T-bill], as published by the Board of Governors of the Federal Reserve

17  System, for the calendar week preceding the date of the judgment."  Here, Plaintiff

18  summarily requests that the Court award interest at a rate of 10 percent instead of the T-bill

19  rate.  Dkt. 37 at 30.  Before the Court considers this request, Plaintiff shall meet and confer

20  with Defendants' counsel to determine whether they can reach an agreement on this issue.

21       53.     Plaintiff also seeks an award of attorneys' fees, pursuant to 29 U.S.C.

22  § 1132(g).  Section 502(g)(1) of ERISA provides that the court has discretion to award "a

23  reasonable attorney's fee . . . to either party."  29 U.S.C. § 1132(g)(1).  To recover fees, a

24  party must establish "some degree of success on the merits."  Hardt v. Reliance Standard

25  Life Ins. Co., 560 U.S. 242, 254 (2010).  The prevailing party in an ERISA action "should

26  ordinarily recover an attorney's fee unless special circumstances would render such an

27  award unjust."  Smith v. CMTA-IAM Pension Trust, 746 F.2d 587, 589 (9th Cir. 1984).

28  Plaintiff indicates, prior to bringing a motion for fees, he will meet and confer with

Defendants' counsel to ascertain whether they can reach an agreement on attorney's fees in this action.

### CONCLUSION

The Court finds that Plaintiff is disabled within the meaning of the Plan, and that Defendants improperly terminated his LTD benefits.  Accordingly,

IT IS HEREBY ORDERED THAT:

1.      Plaintiff's motion for judgment is GRANTED and Defendants' motion for judgment is DENIED.  Defendants shall reinstate Plaintiff's LTD benefits, retroactive to July 23, 2014.

2.      The parties shall meet and confer regarding the proper form of judgment and the amount of benefits, prejudgment interest, attorneys' fees and costs to be awarded.  In the event the parties are able to reach an agreement on the foregoing, they shall submit a stipulation and proposed order for the Court's review.  If no agreement is reached, Plaintiff shall file a joint letter brief setting forth the parties' respective positions.  The Court may refer any remaining disputes to a magistrate judge for a report and recommendation.  The proposed stipulation, or alternatively, letter brief, shall be filed by no later than August 26, 2016.

IT IS SO ORDERED.

Dated:  August 16, 2016

SAUNDRA BROWN ARMSTRONG
Senior United States District Judge